**KURZ–KASCH, INC., Petitioner, Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner,**

**United Electrical Radio and Machine Workers of America, Intervenor.**

Nos. 87–6354, 88–5066.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 21, 1988.

Decided Jan. 13, 1989.

Frank H. Stewart (argued), Taft, Stettinius and Hollister, Timothy P. Reilly, Michael C. Lueder, Cincinnati, Ohio, for petitioner, cross-respondent.

Robin Alexander, Pittsburgh, Pa., for intervenor.

Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Peter Winkler, Scott MacDonald (argued), Washington, D.C., for respondent, cross-petitioner.

Before MERRITT, MARTIN and MILBURN, Circuit Judges.

MERRITT, Circuit Judge.

Kurz–Kasch, Inc., the employer, appeals from the finding of an administrative law judge, upheld by the National Labor Relations Board, that it had failed to reinstate "economic" strikers (as distinguished from "unfair-labor-practice" strikers) in violation of sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3). The N.L.R.B. cross-appeals for enforcement of its order. This dispute raises a narrow question under the Act: when do job "vacancies" arise after a strike to trigger the employer's legal duty to reinstate economic strikers? Because we conclude that the Board and the ALJ did not properly consider the employer's evidence that no "vacancies" existed, we decline enforcement and remand for reconsideration.

Twenty-three members of the United Electrical, Radio & Machine Workers of America went on strike at Kurz–Kasch on March 24, 1980 and returned to work on April 2, 1980. The ALJ determined that, during the strike, Kurz–Kasch hired thirty-one permanent replacements. The first eight of these replacements to leave merely brought Kurz–Kasch's workforce to its pre-strike size. But the ALJ held that, when twenty-six more replacements left Kurz–Kasch, their jobs became available to strikers awaiting reinstatement. Since only nine strikers were recalled, the ALJ ordered Kurz–Kasch to reinstate and make whole the remaining strikers.

Kurz–Kasch claims, however, that no jobs became available because it faced a downturn in business in the months after the strike and was forced to reduce the size of its workforce. It argues that its policy of accomplishing this goal by attrition rather than by layoffs does not alter the fact that no jobs existed for strikers to resume. It complains that the ALJ did not give adequate consideration to the evidence it advanced to support this explanation.

Both parties before us claim protection of important interests recognized as legitimate under the law. On behalf of the economic strikers the Board asserts the statutory right of workers to be free from employer action that illegally discourages union activity. 29 U.S.C. § 158(a)(1), (3). Kurz–Kasch, on the other hand, claims its right to make a business judgment—the number of employees it needs and can afford to maintain—without governmental interference.

Such collisions are endemic to litigation under the NLRA. The Act itself clearly founds its strong policy favoring the right of employees to seek collective bargaining on a national need to prevent labor strife which in the past has become so violent as to disturb the peace and obstruct the free flow of commerce. 29 U.S.C. § 151; see N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 628, 81 L.Ed. 893 (1937); Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 182, 61 S.Ct. 845, 846–47, 85 L.Ed. 1271 (1941); N.L.R.B. v. A. Duie Pyle, Inc., 730 F.2d 119, 126 (3rd Cir.1984). These strong public interests are advanced by the Act's creation of specific organizational rights, which the Board and the Courts have been charged to protect from unfair infringement by employers hostile to their exercise. 29 U.S.C. § 157 (section 7); Golden State Bottling Co. v. N.L.R.B., 414 U.S. 168, 185, 94 S.Ct. 414, 425–26, 38 L.Ed.2d 388 (1973). The Act has never been construed, however, to attack the right of employers to protect their legitimate interests. "Protection of the workers' right to self-organization does not curtail the appropriate sphere of managerial freedom...." Phelps Dodge, 313 U.S. at 182, 61 S.Ct. at 846–47. We may take Justice Frankfurter's summation of the problem as a guide:

The act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them. The employer may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the

other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion.

*Jones & Laughlin Steel Corp.*, 301 U.S. at 45–6, 57 S.Ct. at 628.

Where it is not certain whether an employer's action or failure to act falls within the sphere of the employee's or the employer's legally protected interests, the Board must adopt a mode of inquiry into the facts that respects the interests and policies involved. In construing the NLRA, the Supreme Court has said, "[t]he ultimate problem is the balancing of the conflicting legitimate interests." *N.L.R.B. v. Truck Drivers Local Union No. 449*, 353 U.S. 87, 96, 77 S.Ct. 643, 648, 1 L.Ed.2d 676 (1957).

The balance struck by the Supreme Court in this area has several levels. It is undisputed that economic strikers remain employees even though their posts may have been filled during the strike by permanent replacements. *N.L.R.B. v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 345, 58 S.Ct. 904, 910, 82 L.Ed. 1381 (1938). Unlike unfair-labor-practice strikers, who have the right to resume work at their pre-strike jobs the moment the strike ends, under the balance struck by the Supreme Court workers striking to strengthen their position at the bargaining table may be replaced by permanent replacements but retain the right to reinstatement in their jobs as soon as those jobs become available. This rule carefully accommodates the interests of workers, who Congress has determined must not be discouraged from exercising their rights under the Act, *N.L.R.B. v. Fleetwood Trailer Co., Inc.*, 389 U.S. 375, 378, 88 S.Ct. 543, 545–46, 19 L.Ed.2d 614 (1967), with a countervailing policy protecting the viability of American businesses when they are free from illegal conduct. When an employer fails to reinstate economic strikers, a similar balance must be struck. The Supreme Court has determined what that balance is:

[U]nless the employer who refuses to reinstate strikers can show that his action was due to 'legitimate and substantial business justifications,' he is guilty of an unfair labor practice. (Citation omitted.) The burden of proving justification is on the employer.

*Fleetwood Trailer*, 389 U.S. at 378, 88 S.Ct. at 546 (quoting *N.L.R.B. v. Great Dane Trailers*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967)).

In drawing this rule, the Supreme Court gave special attention to the requirement of section 8(a)(3) that only "discrimination ... to ... discourage" union activity be prohibited. The statute's implicit requirement that employers refrain from acting with antiunion *motive* does not result in a requirement that employees come to the Board with solid proof of the employer's motivations. Instead, the Court set a complex rule that carefully balances the equities involved here. Recognizing that some acts are so " 'inherently destructive' of important employee rights" that they are virtually *per se* unfair labor practices, the Court held that, even if an employer can show that it was otherwise motivated, the Board can find that an unfair labor practice took place. Even where the insult to employee rights is "comparatively slight," and the actual motivations of the employers are determinative, the Court was alert to the fact that employers, not employees, had ready access to evidence of employer motivation. In such cases, proof of antiunion animus is required only after the employer has successfully borne its burden of proving a substantial and legitimate business justification for its acts. *Great Dane Trailers*, 388 U.S. at 33–4, 87 S.Ct. at 1797.

With this explanation of our understanding of the policies and burdens of proof defined by the Supreme Court concerning the filling of "vacancies" created after economic strikes, we come to the narrow question posed by this controversy. A *prima facie* case of a violation is made when it is shown that the employer failed to make an offer of reinstatement "when a job for which the striker is qualified [became] available...." *Fleetwood Trailer*, 389 U.S. at 381, 88 S.Ct. at 547. But when is it permissible to conclude that a job has become "available"? We are called upon here to minimize two dangers: first, the

danger that the Board might order an employer to maintain a workforce larger than is justified by its genuine economic needs; and second, the danger that an employer—silently and without intimating its real purpose—will postpone reinstating economic strikers until they have found legally equivalent work elsewhere or otherwise lost interest in their old jobs. Further, we must respect, as the Supreme Court has done, the fact that the employer has full and free access to evidence of its own motives and of the current demand for its goods or services. The rule that the employer should shoulder the burden of proving that, for legitimate business reasons, it could not maintain vacancies, balances conflicting interests just as aptly here as in cases involving an undisputed failure to reinstate.

*Fleetwood Trailer* points clearly towards this application of the rule. The burden of proving vacancies cannot be placed on the General Counsel: "Such proof is not essential to establish an unfair labor practice. It relates to justification, and the burden of such proof is on the employer." *Fleetwood Trailer*, 389 U.S. at 378 n. 4, 88 S.Ct. at 546 n. 4. And the Court explicitly opened the door to the precise justification advanced in the present case: "the need to adapt to changes in business conditions or to improve efficiency." *Fleetwood Trailer*, 389 U.S. at 379, 88 S.Ct. at 546. The leading Supreme Court case therefore forecloses us from concluding, as the Board concluded in another controversy, that "[i]t is the General Counsel's burden to show that a striker's former job was available." *Lincoln Hills Nursing Home, Inc.*, 257 N.L.R.B. 1145, 1158 (1981).

Subsequent cases, without explicitly addressing the question, have assumed that the lack of vacancies falls to the employer to prove as a business justification. The N.L.R.B. has held that the termination of a worker *"prima facie* create[s] a vacancy" which an employer could rebut by demonstrating a decline in its business. *K–D Lamp Co.*, 229 N.L.R.B. 648, 650 (1977). A similar "legitimate and substantial business justification" was held to have been established where the employer proved that, subject to its contracts with its customers, it was required to maintain an inventory which, in turn, made immediate post-strike replacements unnecessary. *Randall*, 257 N.L.R.B. 1, 6–7 (1981), *enforcement granted in part and denied in part on other grounds sub nom. Randall Div. of Textron, Inc. v. N.L.R.B.*, 687 F.2d 1240 (1982), *cert. denied*, 461 U.S. 914, 103 S.Ct. 1892, 77 L.Ed.2d 282 (1983). The Eleventh Circuit has explicitly taken *Fleetwood Trailer*'s invitation to find justification in purely economic business decisions, holding that a "legitimate and substantial business justification" was demonstrated where an employer proved that, having eliminated a service during the strike, it made a business judgment after the strike that the change both pleased its customers and saved it money. *N.L.R.B. v. Southern Florida Hotel and Motel Ass'n*, 751 F.2d 1571, 1583 (11th Cir.1985).

The ALJ in this case held that vacancies arise whenever a replacement or other worker leaves the employer, and then scrutinized the business justification advanced by Kurz–Kasch. We must conclude that this formulation elides an important step. Where the question is whether vacancies arose, the fact that an employer allows its workforce to decline below the pre-strike level merely creates the presumption that vacancies existed. The employer then bears the burden of proving that no vacancies existed, and one method of proof is to show that it had substantial and legitimate business reasons for deciding that the post was no longer economical. Once it has advanced such proof, the burden shifts back to the General Counsel to show that, in fact, the business reasons advanced are pretextual and the employer's real motivation was to discourage union activity.

The ALJ's rule, however, was not sufficiently incorrect to make it improper for us to review her application of it to the evidence adduced by Kurz–Kasch. The Board's factual determinations are conclusive if, upon the entire record, they are supported by substantial evidence. 29 U.S.C. § 160(e) (section 10(e)); *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951). We are required to review all the evidence that opposes the Board's decision, though we

may not undertake *de novo* review. *Union Carbide Corp. v. N.L.R.B.*, 714 F.2d 657, 660 (6th Cir.1983). Here, the ALJ determined that Kurz–Kasch had adduced no probative evidence of a substantial and legitimate business purpose aside from testimony of Waldo Fannin, and this determination was incorrect. She further found that Fannin's testimony to the effect that Kurz–Kasch's business was down was vague, conclusory, and not credible.

The record discloses nothing to suggest that the ALJ's conclusion as to Fannin's testimony on this point, standing alone, was unreasonable or beyond the bounds of good sense. *Local Union No. 948 v. N.L.R.B.*, 697 F.2d 113, 117 (6th Cir.1982); *Krispy Kreme Doughnut Corp. v. N.L.R.B.*, 732 F.2d 1288, 1293 (6th Cir.1984).

█ We are aware, however, of evidence elsewhere in the record to corroborate Fannin's point, evidence ignored by the ALJ. Testimony of Kathy Stephenson, Tr. 886. The ALJ similarly ignored evidence, both testimonial and documentary, that Kurz–Kasch made a regular practice of shifting employees from one job category to another and that its business was volatile enough that its workforce repeatedly grew and shrank to meet changing demand. Testimony of Waldo Fannin, Tr. 691–2, 699, 701; Exhibit 14. These omissions appear despite the ALJ's obligation to settle all questions of fact explicitly. 29 C.F.R. § 102.45(a). In the past we have treated such omissions as silent determinations that the ignored evidence was not credible. *Eastern Greyhound Lines v. N.L.R.B.*, 337 F.2d 84, 90 (6th Cir.1964). Under that rubric, the mere fact that the evidence is uncontradicted does not warrant a reviewing court to take it as determinative of any issue on appeal. *Eastern Greyhound*, 337 F.2d at 90. But we do conclude that the evidence is directly relevant to Kurz–Kasch's argument that it determined that it had no vacancies for substantial and legitimate business reasons. Indeed, the evidence, particularly Exhibit 14, "is strong enough that we cannot allow it to be dismissed with an unexplained statement that no probative evidence has been introduced." *Eastern Greyhound*, 337 F.2d at 91.

The evidence adduced by Kurz–Kasch is an attempt to explain a complex factual situation, involving several internal transfers of employees and a complex business setting. Rather than displace the Board as factfinder in this situation, we prefer to remand for a full appraisal of the evidence adduced by Kurz–Kasch. It may well be that, when evidence corroborative of Fannin's rejected testimony is carefully sifted, the determination on Fannin's credibility must be rejected. Similarly, in a case as factually complex as this one, we cannot determine whether the evidence is sufficient to meet Kurz–Kasch's burden. It is well within the Board's discretion to reopen the record for introduction of more evidence that would settle the question. 29 C.F.R. § 102.48(b); *Metal Blast, Inc. v. N.L.R.B.*, 324 F.2d 602, 604 (6th Cir.1963); *Road Sprinkler Fitters Local Union No. 669 v. N.L.R.B.*, 789 F.2d 9, 14 (D.C.Cir. 1986); *N.L.R.B. v. Amalgamated Clothing and Textile Workers Union*, 662 F.2d 1044, 1045 (4th Cir.1981).

We therefore remand this matter to the Board for reconsideration in light of this opinion.