**GRANCARE, INC., Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.**

Nos. 96–5838, 96–6086.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 9, 1997.

Decided Feb. 23, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied May 19, 1998.

David W. Miller, Todd M. Nierman (argued and briefed), Baker & Daniels, Indianapolis, IN, for Petitioner/Cross–Respondent.

Richard A. Cohen (argued and briefed), National Labor Relations Board, Office of the General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, National Labor Relations Board, Appellate Court Branch, Washington, DC, for Respondent/Cross–Petitioner.

Before: JONES, SUHRHEINRICH, and MOORE, Circuit Judges.

SUHRHEINRICH, J., delivered the opinion of the court. JONES, J. (pp. 376–377), delivered a separate concurring opinion. MOORE, J. (pp. 377–386), delivered a separate opinion concurring in the judgment.

## OPINION

SUHRHEINRICH, Circuit Judge.

Petitioner–Cross–Respondent Grancare, Inc. d/b/a Heritage Manor ("Heritage") petitions for review of a final decision of the National Labor Relations Board ("NLRB") concluding that Heritage's registered and licensed practical nurses, collectively known as

"charge nurses" are not supervisors within the meaning of Section 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11) (NLRA or Act). The NLRB has cross-petitioned for enforcement of its order that Heritage violated section 8(a)(5), · 29 U.S.C. § 158(a)(1), by refusing to recognize and bargain with Local 332, of the International Brotherhood of Teamsters, as the representatives of Heritage's charge nurses. For the following reasons, we **REVERSE** order of the Board and therefore **DENY** the Board's cross-application for ·enforcement of its order.

## I.

Heritage is a 180–bed, long-term nursing care facility located in Flint, Michigan. The facility consists of three floors, each with 60 beds. The Nursing Department consists of one Executive Director of Nurses (DON), who is responsible for coordinating and managing the Nursing Department and directing its policies and procedures to provide appropriate resident care. Heritage has two Assistant Directors of Nurses (ADON). In addition, Heritage has two Staff Development/In–Service Directors in its Nursing Department. This position is responsible for orienting and training new and current staff. The Staff Development Directors do not directly supervise charge nurses or nurses' aides.

The Nursing Department also has thirty-three RNs and LPNs, known as charge nurses, and approximately 100 certified educated nurses' aides. The charge nurses report to the DON and ADONs. The aides report to the charge nurses.

The Nursing Department operates twenty-four hours a day, seven days a week, on a three-shift schedule. Each floor is staffed by roughly two or three charge nurses and six or seven nurses' aides. During the night shift, there is typically one charge nurse and three nurses' aides assigned to each floor. In all, approximately eighteen nurses and forty-seven nurses' aides staff the facility on any given day.

The DON and one ADON generally work 9:00 a.m. to 5:00 p.m. Monday through Fri-

day. The other ADON comes in early. Thus, one or more of these persons may be present in the facility between 6 a.m. and 5 p.m., Mon–Fri. During their off-hours, the DON and the ADONs are available by phone. One is also designated as the "on-call manager" and is available by beeper. Charge nurses are the highest authority in the facility from approximately 6:00 p.m. to 6:00 a.m., Monday through Friday. On weekends, management is present for four to six hours per day. At all other times on the weekends, the charge nurses are the highest authority in the building.

The Charge Nurse job description describes a charge nurse's "essential duties and responsibilities," as including supervising nursing and ancillary personnel, implementing nursing care plans, participating in progressive discipline and orientation, monitoring and assisting in the evaluation of nursing staff performance, assigning staff based on facility needs, approving overtime, sending employees home as necessary to maintain satisfactory staffing ratios, maintaining rules and regulations of the ·facility, and instructing nursing staff in the provision of nursing care. DON Kim Runci testified that, except for interviewing, hiring, and calling outside agencies to fill in for absent nurses' aides, the job description accurately depicts the charge nurse's duties. Additionally, charge nurses assign lunch and rest breaks, approve changes in lunch and break times, assign and reassign patient and nonpatient care duties, act as the facility supervisor in the absence of other facility management, and adjust nurses' aides' grievances at the first step under the collective bargaining agreement between the aides and Heritage.

On April 25, 1995, the Union filed a representation petition with the NLRB seeking to represent Heritage's charge nurses. On June 22, 1995, the Regional Director for NLRB Region 19 issued a Decision and Order finding that Heritage's charge nurses were not supervisors, and directed an election. Heritage sought review of that decision by the NLRB, which the NLRB ultimately denied. An election was held and the Union was certified as the exclusive bargaining representative. Heritage, however, refused to

recognize and bargain with the Union. The Union filed an unfair labor practice charge with the NLRB, and on June 5, 1996, the NLRB issued a Decision and Order finding that Heritage had unlawfully refused to bargain. Heritage seeks review of the Board's rulings.

## II.

█ The Act defines a supervisor to be an individual who, having authority on behalf of the employer, uses independent judgment to, among other things, assign and direct work, discipline, adjust grievances, or effectively recommend such action. 29 U.S.C. § 152(11).[1] Thus, an individual is a supervisor within the meaning of § 2(11) if she (1) has the authority to engage in one of the twelve enumerated activities; (2) uses independent judgment in exercising that authority; and (3) holds that authority in the "interest of the employer." *NLRB v. Health Care & Retirement Corp. of America,* 511 U.S. 571, 573–74, 114 S.Ct. 1778, 1780–81, 128 L.Ed.2d 586 (1994); *Manor West, Inc. v. NLRB,* 60 F.3d 1195, 1197 (6th Cir.1995); *Health Care & Retirement Corp. of America v. NLRB,* 987 F.2d 1256, 1261 (6th Cir.1993), *aff'd,* 511 U.S. 571, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994).

█ Any individual who meets the statutory test is a supervisor; members of the health care field are not excepted. *Beverly California Corp. v. NLRB,* 970 F.2d 1548, 1556 (6th Cir.1992). Further, because "[p]atient care is the business of a nursing home, [ ] it follows that attending to the needs of the nursing home patients, who are the employer's customers, is in the interest of the employer." *Health Care,* 511 U.S. at 577, 114 S.Ct. at 1782. "It also bears emphasis that § 2(11) uses the disjunctive 'or' in listing the numerous indicia of supervisory status." *Beverly California Corp.,* 970 F.2d at 1552.

█ The Board has the burden of proving that employees are not supervisors.

*NLRB v. Beacon Light Christian Nursing Home,* 825 F.2d 1076, 1080 (6th Cir.1987); *Health Care,* 987 F.2d at 1260 (following *Beacon Light*). In concluding whether substantial evidence supports the Board's decision, the court must consider the entire record. *Hickman Harbor Serv. v. NLRB,* 739 F.2d 214, 219 (6th Cir.1984). Evidence which the Board has ignored but is directly relevant cannot be disregarded. *Kurz–Kasch, Inc. v. NLRB,* 865 F.2d 757, 761 (6th Cir. 1989).

█ Our review of the record reveals that the Board impermissibly shifted the burden of proof to the employer, (*see* Decision and Direction of Election, dated June 22, 1995, p. 21, J.A. 28), ignored substantial evidence, and misconstrued our precedent. For example, the NLRB found that Heritage's charge nurses have the authority to assign aides to specific patients and specific tasks, but found that "the record evidence with respect to the nurses' authority to assign CENAs [nurses' aides] is minimal." (*Id.* at 21). This finding ignores language in the nurses' aides' collective bargaining agreement that provides that a charge nurse "has the authority and responsibility to direct [the aide's] work activities." (J.A. 110). It also ignores the Charge Nurse job description, which states that a charge nurse's "essential duties and responsibilities" include "supervis[ing] nursing and ancillary personnel in implementation of nursing care plans as assigned," (*Id.* 128), and "assign[ing] staff based on unit/facility needs." (*Id.* at 129). Furthermore, various witnesses testified that charge nurses assign and reassign aides to particular patients and tasks, as well as authorize lunch and rest breaks. (*Id.* 321–26; 990–91). Although the Regional Director did not address it, the employer introduced evidence that charge nurses have the authority to delay or cancel an aide's break if necessary. (*Id.* 1128–29; 403–04; 612–13).

1. 29 U.S.C. § 152(11) provides:
    (11) The term "supervisor" means any individual having authority in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of merely routine of clerical nature, but requires the use of independent judgment.

The Regional Director concluded that this evidence "does not establish any real independent judgment." This conclusion is clearly contrary to Sixth Circuit precedent. *See, e.g., Caremore, Inc. v. NLRB*, 129 F.3d 365 (6th Cir.1997) (holding that LPNs were supervisors where Regional Director found that LPNs provided direction to aides involving "aspects of patient care" and record also demonstrated that LPNs are substantially involved in evaluation and discipline of aides); *Manor West*, 60 F.3d at 1195 (finding that substantial evidence did not support the Board's conclusion that LPNs were not "supervisors" where employer offered evidence that nurses had authority to direct care of patients); *Health Care*, 987 F.2d 1256 (holding that LPNs and RNs were "supervisors" where it was clear that duties of staff nurse clearly required both assigning aides to specific tasks and directing the operation of the aides, as well as the entire nursing home, when DON or assistant was not present); *Beverly California Corp.*, 970 F.2d 1548 (holding that RNs were supervisors within meaning of § 2(11) where they were responsible for making sure staff employees provided adequate patient care, and had authority to transfer LPN's and nurses' aides between wings); *Beacon Light*, 825 F.2d 1076 (holding that LPNs and RNs were supervisors although LPNs did not have power to discharge or promote, LPNs' recommendations could lead to formal discipline action, LPNs instructed nurses' aides and were their team leaders, assigned patients to nurses' aides, and were responsible for their work).

The Regional Director also made findings, at least tacitly, that charge nurses have authority to discipline, but discounted all the proof. For example, the Regional Director found that:

> [o]f the 21 documents offered as evidence that RNs and LPNs have statutory authority to discipline, only four disciplinary forms and one consultation report reflect that a written warning was recommended or given. Three of the four disciplinary forms were written by one LPN, and all four concern the same employee, without any evidence whatever that any *progressive* discipline having been imposed. Of the Employer's approximately 32 RNs and LPNs, the evidence does not establish that more than three have given or recommended written warnings.

(J.A. 26). The Regional Director concluded that "[a]t best, the exhibits represent isolated incidents of supervision insufficient to elevate the nurses as a whole to supervisory level." (J.A. 26).

■ This view is directly contrary to Sixth Circuit precedent. "It is the existence of disciplinary authority that counts under the statute, and not the frequency of its exercise." *Beverly California Corp.*, 970 F.2d at 1550 n. 3 (citation omitted); *Caremore*, 129 F.3d at 369–70. There is ample proof that charge nurses had written authority to discipline. *See id.* (noting that RN supervisors had written authority to impose discipline and were under instructions to exercise that authority if necessary). Both the Standards of Conduct and the Charge Nurse job description provide for it. The Regional Director's own findings verify that the charge nurses exercised this authority.

Although the Regional Director also brushed it aside, the fact that charge nurses are the most senior ranking authority in the Nursing Department for twelve hours per day during the weekdays, and for most of the weekend is significant. Under the Board's view, there was no on-site supervisory personnel almost half of the time. "This is not a reasonable conclusion for a well-run nursing home. . . . " *Beacon Light*, 825 F.2d at 1080; *Caremore*, 129 F.3d at 370–71.

Because § 2(11) requires only one of the twelve listed activities be satisfied, and the other elements of the statute are clearly present, the foregoing easily establishes that Heritage's charge nurses are "supervisors." Thus, Heritage's petition for review is **GRANTED**; the NLRB's cross-petition for enforcement is **DENIED**; and the order of the NLRB is **VACATED**.

NATHANIEL R. JONES, Circuit Judge, concurring.

I concur in my colleague's well reasoned opinion. I write briefly to emphasize that the determination of whether charge nurses are supervisors under the National Labor

Relations Act, is a highly-fact bound issue. *See, e.g., NLRB v. Res–Care, Inc.,* 705 F.2d 1461, 1468 (7th Cir.1983) (noting that the application of section 2(11) has given rise to extensive but highly-fact bound litigation, and thus other decisions involving nurses provide little guidance). Therefore, each case must be scrutinized and resolved individually. Although this court has amassed a significant amount of precedent finding that charge nurses were supervisors under the specific facts of some cases, *see Caremore, Inc. v. NLRB,* 129 F.3d 365 (6th Cir.1997); *Health Care & Retirement Corp. of America v. NLRB,* 987 F.2d 1256 (6th Cir.1993), *aff'd,* 511 U.S. 571, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994); *Beverly California Corp. v. NLRB,* 970 F.2d 1548 (6th Cir.1992); *NLRB v. Beacon Light Christian Nursing Home,* 825 F.2d 1076 (6th Cir.1987) that by no means precludes a finding that charge nurses are not supervisors were the facts of a particular case to substantiate such a conclusion.

Additionally, although we are clearly bound by Sixth Circuit precedent which places the burden on the Board to prove that employees are not supervisors, I agree with Judge Moore's thoughtful concurrence that the Board's placement of that burden on the employer is a reasonable construction of the Act. As Judge Moore notes, the determination of supervisory status with regard to professionals is a sensitive and difficult one because of the myriad number of tasks such persons perform. The lines are not always clear in cases like this, where the employees at issue are highly trained individuals whose daily tasks include life and death decisions. Nevertheless, I find that on the facts of this case, the Grancare charge nurses exercised supervisory authority. I reiterate, however, that because of the fact based nature of such a determination, and the difficulty associated with categorizing professionals, courts must be reluctant to override the determination of the Board whose expertise in this subject is well known. I too, am troubled by the Sixth Circuit's apparent ease by which it discounts the findings of the Board, but feel that in this case such a conclusion was appropriate. I therefore concur.

KAREN NELSON MOORE, Circuit Judge, concurring in the judgment.

In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court announced that where Congress fails to speak directly to the "precise question at issue," the courts must defer to an agency's interpretation if it "is based on a permissible construction of the statute." *Id.* at 842, 843, 104 S.Ct. at 2781, 2781–82. As recently explained by the Court:

> When the legislative prescription is not free from ambiguity, the administrator must choose between conflicting reasonable interpretations. Courts, in turn, must respect the judgment of the agency empowered to apply the law "to varying fact patterns," even if the issue "with nearly equal reason [might] be resolved one way rather than another."

*Holly Farms Corp. v. NLRB,* 517 U.S. 392, 398–99, 116 S.Ct. 1396, 1401, 134 L.Ed.2d 593 (1996) (quoting *Bayside Enterprises, Inc. v. NLRB,* 429 U.S. 298, 302, 304, 97 S.Ct. 576, 579–80, 581, 50 L.Ed.2d 494 (1977)) (alteration in original); *see also NLRB v. Americare–New Lexington Health Care Ctr.,* 124 F.3d 753, 756 (6th Cir.1997); *NLRB v. Webcor Packaging, Inc.,* 118 F.3d 1115, 1119 (6th Cir.1997). Moreover, courts should defer to the Board's findings of fact where supported by "substantial evidence on the record." *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 42, 107 S.Ct. 2225, 2235, 96 L.Ed.2d 22 (1987). "[T]his court cannot substitute its own findings for those of the Board merely because substantial evidence may support both." *YHA, Inc. v. NLRB,* 2 F.3d 168, 172 (6th Cir.1993).

In cases involving nursing personnel, however, the Sixth Circuit repeatedly insists on substituting its own legal interpretation of ambiguous language contained in § 2(11) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 152(11), defining the term "supervisor," for that of the National Labor Relations Board ("the Board"). Because I believe the Board's construction of § 2(11) to be reasonable in light of the congressional intent underlying the Act, I must object to

this circuit's unwillingness to defer to the Board's construction. Moreover, in reviewing the Board's findings of fact, this court frequently displaces the Board's choice between two conflicting views of the evidence where substantial evidence supports both views. We simply are forbidden from engaging in this de novo review of the evidence. *See YHA,* 2 F.3d at 172.

## I. BURDEN OF PROVING SUPERVISORY STATUS

The Board repeatedly has placed the burden of proving supervisory status upon the employer where, as here, the employer is the party asserting supervisory status in order to exclude employees from coverage under the Act. *See, e.g., Bozeman Deaconess Found. d/b/a Bozeman Deaconess Hosp. and Montana Nurses Ass'n,* 322 N.L.R.B. 1107, 1107 n. 4, 1997 WL 73190, at *4 n. 4 (Feb. 18, 1997); *Beverly Enter.—Ohio d/b/a/ Northcrest Nursing Home,* 313 N.L.R.B. 491, 496 n. 26, 1993 WL 513158, at *23 n. 26 (Nov. 26, 1993); *Ohio Masonic Home, Inc.,* 295 N.L.R.B. 390, 393, 1989 WL 224141, at *5 (June 15, 1989). In drafting the Act, Congress did not speak directly as to which party bears the burden of proving supervisory status. We therefore must defer to the Board's position if it derives from a reasonable construction of the Act. *See Holly Farms,* 517 U.S. at 397–99, 116 S.Ct. at 1401.

The legislative history of § 2(11) demonstrates Congress's intent that only those who are "truly supervisory," as opposed to those with minor supervisory duties, be excluded from the Act's coverage. S.REP. No. 80–105, at 19 (1947). The Board concluded that this legislative history "indicates that Congress chose to err on the side of narrowness rather than breadth in the exclusion." *Ohio Masonic Home,* 295 N.L.R.B. at 393 n. 7, 1989 WL 224141 at *8 n. 7. As the Supreme Court has cautioned, "administrators and reviewing courts must take care to assure that exemptions from NLRA coverage are not so expansively interpreted as to deny protection to workers the Act was designed to reach." *Holly Farms,* 517 U.S. at 399, 116 S.Ct. at 1401. In an effort to effectuate Congress's

purpose that the exclusion of supervisors from the Act's protections be a limited one, the Board places the burden of proving supervisory status upon those invoking the exemption. *See Beverly Enter.–Ohio,* 313 N.L.R.B. at 496 n. 26, 1993 WL 513158, at *23 n. 26. In contrast, placing the burden of proof on the Board presumes that all employees simply asserted by employers to be supervisors are exempt from the Act's coverage until proven otherwise. Thus, the Board's approach is a reasonable construction of the Act that respects the legislative intent behind § 2(11).

The Board's position finds additional support in judicial precedent. The Supreme Court in *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), held that although the Board has the burden of proving each element comprising an unfair labor practice, the Board may place the burden of proof on the party asserting a matter that is essentially an affirmative defense. *See id.* at 401–02, 103 S.Ct. at 2474–75. In placing the burden of proving an employee's supervisory status on the employer, the Board in effect treats the supervisory exemption as an affirmative defense to an unfair labor practice under § 8(a)(5), 29 U.S.C. § 158(a)(5), which prohibits an employer from refusing to recognize and bargain with the elected representatives of its employees. By analogy, judicial treatment of exemptions under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.,* supports the Board's position. The Supreme Court has held that employers must prove the applicability of any of FLSA's exemptions before denying employees the rights granted them under the statute. *See Idaho Sheet Metal Works, Inc. v. Wirtz,* 383 U.S. 190, 209, 86 S.Ct. 737, 748–49, 15 L.Ed.2d 694 (1966) ("[T]he burden of proof respecting exemptions is upon the company."); *see also Douglas v. Argo–Tech Corp.,* 113 F.3d 67, 70 (6th Cir.1997); *Michigan Ass'n of Governmental Employees v. Michigan Dep't of Corrections,* 992 F.2d 82, 83 (6th Cir.1993). Because the National Labor Relations Act similarly protects the interests of employees, the Board's extension of the holding in *Idaho Sheet Metal Works* to cases

arising under the NLRA is reasonably defensible.

Finally, the Board advances several practical considerations in justification of its placement of the burden of proving supervisory status on the party invoking the exemption. The Board argues that placing the burden of proof upon the Board is infeasible because the Board is not a party to the earlier proceedings. *See Beverly Enter.– Ohio,* 313 N.L.R.B. at 496 n. 26, 1993 WL 513158, at *23 n. 26. Moreover, placing the burden of proof upon the Board requires proof of a negative—proof that an employee does not exercise *any* of the twelve statutory indicia of supervisory status when using independent judgment. *See id.* In contrast, placing the burden of proof on the employer, the party with superior access to the relevant proof, would narrow the inquiry from all twelve enumerated activities to the specific supervisory activities in which the nurses allegedly participate.

In sum, the Board's placement of the burden of proving supervisory status upon the employer derives from a reasonable construction of the Act which respects legislative intent. Judicial precedent and practical considerations lend further support to the Board's position. Several other circuits have upheld the Board's position. *See Beverly Enter.—Pennsylvania, Inc., d/b/a/ Grandview Health Care Ctr. v. NLRB,* 129 F.3d 1269, 1270 (D.C.Cir.1997) (stating employer failed to show supervisory status of LPNs); *Schnuck Markets, Inc. v. NLRB,* 961 F.2d 700, 703 (8th Cir.1992) (stating that the employer "bears the burden of proving supervisory status"); *NLRB v. Bakers of Paris, Inc.,* 929 F.2d 1427, 1445 (9th Cir.1991) ("[T]he burden of proving supervisory status rests upon the party asserting it."). In contrast, Sixth Circuit precedent states that the Board has the burden of proving that employees are not supervisors, *see NLRB v. Beacon Light Christian Nursing Home,* 825 F.2d 1076, 1080 (6th Cir.1987) ("The Board always has the burden of coming forward with evidence showing that the employees are not supervisors."). *See also Health Care & Retirement Corp. of Am. v. NLRB,* 987 F.2d 1256, 1259 (6th Cir.1993) (stating that the Board must prove employee status), *aff'd on other grounds,* 511 U.S. 571, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994). Nonetheless, the Supreme Court's recent decision in *Holly Farms* requires us to abandon our judicial precedent and defer to the Board's interpretation where it is "rational and consistent with the Act." *Health Care & Retirement Corp.,* 511 U.S. at 576, 114 S.Ct. at 1781. This court should therefore reexamine its position regarding the burden of proof of supervisory status.

## II. IDENTIFYING SUPERVISORY NURSING PERSONNEL

The Act defines the term "supervisor" as follows:

> The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). As the Supreme Court has formulated the appropriate test, three components must be satisfied in order for an employee to be found to be a supervisor: she must have the authority to engage in one of the twelve activities; she must use independent judgment in exercising that authority; and she must hold the authority "in the interest of the employer." *Health Care & Retirement Corp.,* 511 U.S. at 573–74, 114 S.Ct. at 1780. At issue in this case are the first and second components: do the charge nurses have authority to engage in any of the twelve enumerated activities, and if so, do they use independent judgment in exercising such authority.

This case asks us to consider whether the registered and licensed practical nurses ("LPNs") employed by Heritage Manor are supervisors as defined by § 2(11) of the Act. The employer contends that all nurses in its employ are supervisors, but the Board concluded otherwise. The majority asserts that the nurses have authority to assign and di-

rect aides, and that they exercise independent judgment in doing so. The majority also concludes that the nurses have the authority to discipline aides, and that they exercised this authority. Finally, the majority asserts that because the nurses are the most senior ranking on-site nursing personnel on weeknights and much of the weekends, they must be supervisors. Each of these conclusions rejects reasonable interpretations of the statute by the Board and the substantial evidence supporting the Board's conclusions.

### A. The Meaning of "Responsibly to Direct" or to "Assign" Using "Independent Judgment"

As the Supreme Court recognized in *NLRB v. Health Care & Retirement Corp. of Am.*, 511 U.S. 571, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994), the phrases "responsibly to direct" and "independent judgment" are ambiguous. *See id.* at 579, 114 S.Ct. at 1783. Accordingly, "the Board needs to be given ample room to apply them," *id.*, and the courts should defer to the Board's construction of the phrase where its construction is reasonable. *See Holly Farms*, 517 U.S. at 397–99, 116 S.Ct. at 1401.

In assessing the reasonableness of the Board's interpretation, we must be mindful of the congressional intent underlying the Act's supervisory exemption. Congress excluded supervisors from the Act's coverage in its 1947 amendments to the Act. *See* 29 U.S.C. § 152(3). The Report of the Senate Committee on Labor and Public Welfare accompanying the bill explained that Congress wished to assure that management was not deprived "the undivided loyalty of its representatives." *NLRB v. Yeshiva Univ.*, 444 U.S. 672, 682, 100 S.Ct. 856, 862, 63 L.Ed.2d 115 (1980); *see also* S.REP. No. 80–105, at 4–5. The Senate Report noted, however, that in defining "supervisors," "the committee exercised great care, desiring that the employees ... excluded from the coverage of the act be *truly* supervisory," *id.* at 19 (emphasis added), and was mindful "of the fact that certain employees with *minor* supervisory duties have problems which may justify their inclusion in [the] act." *Id.* at 4 (emphasis added). In other words, Congress sought to distinguish "between straw bosses, leadmen, set-up men, and other minor supervisory employees, on the one hand, and the supervisor vested with such genuine management prerogatives as the right to hire or fire, discipline, or make effective recommendations with respect to such action." *Id.* Thus, in evaluating the Board's application of § 2(11), we must take care not to eviscerate Congress's intent to afford the Act's protections to those with "minor" supervisory responsibilities.

At the same time that Congress exempted supervisors from the class of employees afforded protection under the Act, it made clear that "professionals" were covered by the Act. The Act defines the term "professional employee" as follows:

> [A]ny employee engaged in work (i) predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work; (ii) involving the consistent exercise of discretion and judgment in its performance; (iii) of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; (iv) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study....

29 U.S.C. § 152(12)(a). The categories "supervisor" and "professional" may overlap, and we must read the two provisions *in pari materia.* Because "administrators and reviewing courts must take care to assure that exemptions from NLRA coverage are not so expansively interpreted as to deny protection to workers the Act was designed to reach," *Holly Farms*, 517 U.S. at 399, 116 S.Ct. at 1401, we must take care not to define the term "supervisor" so as to obliterate Congress's intent to include working professionals within the Act's protections. *Cf. Yeshiva*, 444 U.S. at 690, 100 S.Ct. at 866 (indicating that the judicially implied managerial exclusion should not be applied so as to "sweep all professionals outside the Act in derogation of Congress' expressed intent to protect them").

### 1. "Responsibly to Direct"

Mindful of this legislative history, the Board follows this circuit's half-century-old construction of the phrase "responsibly to direct" in treating the phrase as only applying to those employees "answerable for the discharge of a duty or obligation." *See Providence Hospital and Alaska Nurses' Ass'n,* 320 N.L.R.B. 717, 728, 1996 WL 46343, at *19 (Jan. 3, 1996) (quotation omitted); *see also Ohio Power Co. v. NLRB,* 176 F.2d 385, 387 (6th Cir.), *cert. denied,* 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553 (1949). In other words, the factual evidence must show that the individual has "ultimate responsibility," *see Northeast Utilities Serv. Corp. v. NLRB,* 35 F.3d 621, 625 (1st Cir.1994), *cert. denied,* 514 U.S. 1015, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995), or is " 'answerable' to the employer for other employees' discharge of a duty or obligation." *Providence Alaska Med. Ctr. v. NLRB,* 121 F.3d 548, 554 (9th Cir.1997). In cases involving the supervisory status of nurses, however, this circuit has departed from its precedent in *Ohio Power Co.* and now simply requires that the nurses "direct" the work of others, thereby effectively reading out of the statute the word "responsibly." For example, in *Caremore, Inc. v. NLRB,* 129 F.3d 365 (6th Cir.1997), this court held that LPNs who provide limited direction to nursing aides had the authority "responsibly to direct" the work of aides without first considering whether the LPNs were accountable for the work performed by the aides. *See id.* at 369. The majority in the instant case not only foregoes an examination of whether Grancare holds its nurses responsible for the performance of its nurses' aides, but completely eliminates the words "responsibly to" from in front of the word "direct" when explaining the statutory requirements of § 2(11). The legislative history clearly shows Congress's intent to distinguish "minor supervisory employees" from those supervisors "vested with such genuine management prerogatives," *see* S.REP. NO. 80–105, at

4, and to afford the former the protections of the Act. By ignoring Congress's deliberate inclusion of the word "responsibly," this circuit only provides lip service to Congress's intent.

### 2. "Independent Judgment"

Even assuming that the nurses employed by Grancare have the authority "responsibly to direct" the nurses' aides with whom they work, or the authority to "assign" work, they do not exercise this authority with "independent judgment." The Act states that supervisory conduct which is "of a merely routine or clerical nature" does not involve the use of "independent judgment." 29 U.S.C. § 152(11). In applying this provision to cases involving the supervisory status of nursing personnel, the Sixth Circuit has broadly interpreted the phrase "independent judgment" as including "sensitive and nuanced judgments." *Caremore,* 129 F.3d at 369; *see also Beverly California Corp. v. NLRB,* 970 F.2d 1548, 1553 (6th Cir.1992) ("It is perfectly obvious that the kind of judgment exercised by registered nurses in directing LPNs and nurse's aides in the care of patients .... is not 'merely routine.' "). This definition of independent judgment, however, encompasses the decisions made by all professionals, who by definition exercise judgment in the sense that their work is "predominantly intellectual" rather than "routine." 29 U.S.C. § 152(12). Since many professionals have the authority either to assign or to direct the work of other employees,[1] *see NLRB v. Res–Care, Inc.,* 705 F.2d 1461, 1465 (7th Cir.1983), broadly defining "independent judgment" to include all discretionary or reasoned decision-making would result in very few professionals receiving the Act's protections. *See* Kristen Hay O'Neal, Comment and Note, *NLRB v. Health Care & Retirement Corporation of America: Possible Implications for Supervisory Status Analysis of Professionals Under the National Labor Relations Act,* 47 BAYLOR L. REV.

---

**1.** Professionals often are assisted by support personnel, and thus exercise "supervision" to the extent that they direct the work of their aides. *See* Daniel D. Barker, Note, *NLRB v. Health Care & Retirement Corp.: Erosion of NLRA Protection for Nurses and Other Professionals?,* 1996 WIS.

L.REV. 345, 352 (1996). For example, many professionals direct the work of their secretaries, teachers direct their teachers' aides, and lawyers direct paralegals. *See NLRB v. Res–Care, Inc.,* 705 F.2d 1461, 1465 (7th Cir.1983).

841, 864 (1995) ("The threat that the scope afforded the meaning of supervisor will completely engulf the inclusion of professionals is very real."). In light of Congress's express intent to include professionals among the class of employees covered by the Act, the phrase "independent judgment" must mean something more than simply making "sensitive and nuanced judgments."

In an effort to harmonize Congress's clear intent to exclude supervisors from the Act's coverage while including professionals within the class of covered employees, the Board has properly focused on the policies behind the supervisor exemption—providing employers with a group of employees who are loyal to management and who share management's concerns and prerogatives. *See* S.REP. No. 80–105, at 4. In assessing whether charge nurses exercise "independent judgment," the Board considers whether the nurses possess management prerogatives greater than merely

> the authority of an employee to direct another to perform discrete tasks stemming from the directing employee's experience, skills, training, or position, such as ... the direction which is given by an employee with specialized skills and training which is incidental to the directing employee's ability to carry out that skill and training, and the direction which is given by an employee with specialized skills and training to coordinate the activities of other employees with similar specialized skills and training.

*Providence Hospital,* 320 N.L.R.B. at 729, 1996 WL 46343, at \*20; *cf. NLRB v. Sayers Printing Co.,* 453 F.2d 810, 814 (8th Cir.1971) (employees who had the authority to "assign" and "responsibly to direct" other employees did not exercise independent judgment where they "merely carried out [the] directions or policies" of management). The Board's focus on whether a nurse's authority flows from management rather than her professional experience recognizes a "distinction between authority arising from professional knowledge and authority encompassing front-line management prerogatives." *Health Care & Retirement Corp.,* 511 U.S. at 583, 114 S.Ct. at 1785. "Only if an employ-ee's activities fall outside the scope of the duties routinely performed by similarly situated professionals will he be found aligned with management." *Yeshiva,* 444 U.S. at 690, 100 S.Ct. at 866. Because the Board's construction of the ambiguous phrase "independent judgment" is clearly a "permissible construction" in light of congressional intent and judicial precedent, *Chevron* and *Holly Farms* require us to defer to the Board's interpretation.

Applying the Board's statutory construction to the facts of this case, I conclude that substantial evidence supports the finding that the nurses employed by Grancare did not exercise their authority to "assign" or "responsibly to direct" the work of the nursing aides with "independent judgment." Although the nurses assigned aides to particular rooms or patients and could approve or change their lunch or smoking breaks, the aides' assignments were based on week-long rotations through sections. Thus, the nurses exercised their authority to "assign" the aides within narrow boundaries, rendering the exercise of their authority merely routine or clerical. *See Beverly Enter.—Pennsylvania,* 129 F.3d at 1270 ("If an individual's discretion with respect to assignment, discipline, or the other statutory factors is tightly constrained, then her exercise of that authority is 'routine' and does not involve 'independent judgment.' "); *Providence Alaska Medical Ctr.,* 121 F.3d at 552 (stating that charge nurses do not use independent judgment where "they make assignments of nurses to patients within the parameters of the supervisory nurse's monthly assignment schedule"); *Waverly–Cedar Falls Health Care Ctr., Inc. v. NLRB,* 933 F.2d 626, 630 (8th Cir.1991) (holding that LPNs' authority to assign work to aides did not involve independent judgment where authority to assign work to aides simply involved following management's policy and procedure). Moreover, the nurses' direction of the aides was limited to reminding the aides of patients' needs, such as giving fluids to a resident who requires such fluids or paying special attention to a patient who is ill or agitated. As other circuits have recognized, such limited involvement in directing the work of aides occurs within tight constraints, and is therefore

merely routine and does not require independent judgment. *See Beverly Enter.—Pennsylvania,* 129 F.3d at 1270; *Providence Alaska Medical Ctr.,* 121 F.3d at 554; *Waverly–Cedar Falls,* 933 F.2d at 630; *Res–Care,* 705 F.2d at 1468.

The fact that at times the nurses were the most senior ranking authority in the home is of little significance and does not invalidate the Board's findings. At all times, the Director of Nursing or an Assistant Director of Nursing was on-call and reachable by beeper, thereby indicating that ultimate responsibility rests with these truly supervisory nurses and not with the staff nurses. *See Providence Alaska Medical Ctr.,* 121 F.3d at 554 ("That a supervisory nurse is not present during some shifts does not necessarily indicate the charge nurses are supervisors."); *Waverly–Cedar Falls,* 933 F.2d at 630 (same); *Res–Care,* 705 F.2d at 1467 (same); *cf. Northeast Utils. Serv. Corp.,* 35 F.3d at 625 (most senior employees present during nonbusiness hours were not supervisors where they did not have ultimate responsibility for the plant's performance and a supervisor was always on call); *Highland Superstores, Inc. v. NLRB,* 927 F.2d 918 (6th Cir.1991) (fact that leadmen worked at hours when they were highest ranking employees on duty did not render the leadmen supervisors); *NLRB v. City Yellow Cab Co.,* 344 F.2d 575, 581–82 (6th Cir.1965) (stating that at times where no representatives of management were present, switch-board operators were not supervisors in part because company officers were at all times reachable by phone). In today's modern world of beepers, cordless phones, and fax machines, a supervisor need not be physically present to exercise supervision over the workplace.

### B. "Having Authority" to "Discipline" Using "Independent Judgment"

In determining whether the nurses employed by Grancare disciplined or had the authority to discipline the aides and used independent judgment in doing so, once again we must be mindful of Congress's intent to provide employers a group of loyal managerial and supervisory employees while at the same time affording the Act's protec-

tions to leadmen and other minor supervisors, as well as to professionals.

### 1. Actual Authority

The majority concludes that the nurses in this case are supervisors because their job description states that charge nurses will participate in the "progressive discipline" of nursing personnel, the first level of which is a written warning according to the terms of the collective bargaining agreement between Grancare and the nurses aides. According to the majority, this job description alone "is ample proof" of the existence of the nurses' authority to discipline. *Maj. Op.* at 376; *see also Beverly California Corp.,* 970 F.2d at 1550 n. 3. The Act, however, requires "evidence of *actual* supervisory authority visibly translated into tangible examples demonstrating the existence of such authority." *Oil, Chem. and Atomic Workers Int'l Union, AFL–CIO v. NLRB,* 445 F.2d 237, 243 (D.C.Cir.1971) (emphasis added), *cert. denied,* 404 U.S. 1039, 92 S.Ct. 713, 30 L.Ed.2d 730 (1972). The Act defines supervisor as "any individual *having* [the] authority" described therein. 29 U.S.C. § 152(11) (emphasis added). Where written authority proves false or illusory, an individual certainly does not have actual supervisory authority. As explained by the Fifth Circuit,

> what is amiss with [the] argument which is based on paper credentials is that there is lack of actual authority to match. The concept of supervision has some elasticity, but it must have substance and not be evanescent. Statutory supervision requires some suiting of the action to the words and the words to the action.... A supervisor may have potential powers, but theoretical or paper power will not suffice. Tables of organization and job descriptions do not vest powers.

*NLRB v. Security Guard Serv., Inc.,* 384 F.2d 143, 149 (5th Cir.1967) (quoted in part in *Oil, Chem. and Atomic Workers Int'l Union v. NLRB,* 547 F.2d 575, 583 (D.C.Cir.), *cert. denied,* 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977)); *cf. NLRB v. Dickerson–Chapman, Inc.,* 964 F.2d 493, 497 (5th Cir.1992) (holding that an employee's job title is not "automatically controlling;" rather,

"[t]he employee's actual authority and responsibility determine whether he is a supervisor"); *NLRB v. Wilson–Crissman Cadillac, Inc.*, 659 F.2d 728, 730 (6th Cir.1981) ("[T]he specific job title of the employer is not controlling. Courts must examine the employee's actual job responsibility, authority, and relationship to management."); *Automation and Measurement Div., The Bendix Corp. v. NLRB*, 400 F.2d 141, 148 (6th Cir. 1968) ("[T]he employer cannot make a supervisor out of a rank and file employee simply by giving him the title and theoretical power to perform one or more of the enumerated supervisory functions. The important thing is the possession and exercise of actual supervisory duties and authority and not the formal title.") (quoting *NLRB v. Southern Bleachery & Print Works, Inc.*, 257 F.2d 235 (4th Cir.1958), *cert. denied*, 359 U.S. 911, 79 S.Ct. 588, 3 L.Ed.2d 575 (1959)); *NLRB v. Aerovox Corp. of Myrtle Beach, S.C.*, 435 F.2d 1208, 1210 (4th Cir.1970) (same). To hold that written authority alone demonstrates that individuals have supervisory authority enables an employer to evade the requirements of the Act by simply granting employees supervisory authority on paper only. Accordingly, we should permit the Board to rely on evidence showing the absence of actual supervisory authority, such as the nonexercise of such authority or a lack of knowledge as to the existence of such authority. *See Dickerson–Chapman*, 964 F.2d at 498 n. 6 (stating that the Board may discredit job descriptions indicating that the employees in question had supervisory authority where there was no other evidence indicating they had such authority, and evidence suggested the absence of such authority).

### 2. Disciplinary Authority

The Board previously has stated that "for the issuance of reprimands or warnings to constitute statutory supervisory authority, the warning must not only initiate, or be considered in determining future disciplinary action, but also it must be the basis of later personnel action without independent investigation or review by other supervisors." *Passavant Health Ctr.*, 284 N.L.R.B. 887, 890, 1987 WL 89767, at *5 (July 9, 1987). By focusing on the consequences of such disciplinary action, i.e., whether it has significant implications for an aide's job status, the Board's statutory construction properly balances Congress's competing policies by ensuring that an employee's disciplinary authority flows from management and reflects management's concerns. Because *Holly Farms* requires deference to the Board's statutory construction where reasonable, *see Holly Farms*, 517 U.S. at 397–99, 116 S.Ct. at 1401, this court must defer to the Board's definition of disciplinary authority.

### 3. "Independent Judgment"

Cognizant of Congress's intent that the supervisory exemption apply only to those "vested with ... genuine management prerogatives," S.REP. No. 80–105, at 4, the Board looks at the extent to which the nurses in question decide whether an aide's misconduct requires any disciplinary action, and if so, what level of disciplinary punishment is appropriate. *See Illinois Veterans Home at Anna L.P. and AFSCME, Council 31, AFL–CIO*, 323 N.L.R.B. No. 161, 1997 WL 314739, at *2 (June 6, 1997). Nurses will not be considered supervisors where individuals senior to the nurses independently review the incident and the aide's employment history in deciding whether to impose discipline. *See id.* (concluding charge nurses did not use independent judgment in exercising the authority to discipline aides where the Director of Nursing's "decision to impose discipline is based on her independent judgment in assessing the nature and frequency of the incident reports, as well as any other form in the employee's file"). Moreover, where a nurse exercises her disciplinary authority within narrow boundaries, she does not exercise such authority using "independent judgment" but rather, her authority is merely "routine." *See Beverly Enter.—Pennsylvania*, 129 F.3d at 1270. Because the Board's statutory construction respects Congress's intent to distinguish true supervisory authority from both minor supervisory authority and authority arising from professional knowledge, this court must defer to the Board's permissible construction of the Act. *See Chevron*, 467 U.S. at 842, 843, 104 S.Ct. at 2781, 2781–82;

*Holly Farms,* 517 U.S. at 397–99, 116 S.Ct. at 1401.

### 4. Grancare's Nurses

The Board concluded that contrary to the nurses' job descriptions, they do not possess the authority to discipline aides. Under the nurses' aides' collective bargaining agreement with Grancare, the aides are subject to a system of progressive discipline, in which the first level of punishment is a written warning, the second level is a suspension, and the third level is a discharge. The nurses could not independently impose a punishment under the progressive discipline system because the imposition of discipline requires a review of an aide's personnel file, and the nurses do not have access to those files. J.A. at 305, 369–70, 442–44. Moreover, before imposing any disciplinary punishment, the Director of Nursing or an Assistant Director of Nursing holds a disciplinary meeting with the aide and union steward. J.A. at 304, 632. The nurse reporting the incident which prompted the meeting often does not attend this meeting, J.A. at 305, 688, and her involvement when present is limited to that of a fact witness. J.A. at 689–91. Because substantial evidence supports the Board's finding that, contrary to their job description, the nurses employed by Grancare do not participate in the progressive discipline of nursing personnel in any meaningful manner, we should defer to the Board's finding that the nurses lack actual disciplinary authority.

Even if the nurses did possess disciplinary authority, they cannot be said to exercise this authority using independent judgment. To the extent that nurses exercise disciplinary authority, their discretion is tightly constrained. The collective bargaining agreement between Grancare and the aides, and not the nurses, determines the standards of conduct governing the aides' work, including which behaviors "will not be tolerated." J.A. at 110–15 (Collective Bargaining Agreement App. C). In addition, as explained above, nurses do not determine the appropriate level of punishment for an aide's misconduct; rather, the Director of Nursing or an Assistant Director of Nursing conducts an independent review of the incident and imposes a punishment, if any, under the progressive discipline system. Consequently, even assuming that the nurses have the authority to discipline, their exercise of that authority is routine and does not entail the exercise of independent judgment as required by the statutory definition of a supervisor.

### C. The Authority "Effectively to Recommend" Disciplinary Action

Although the majority opinion does not address whether the nurses had the authority "effectively to recommend" disciplinary action, the Board considered the issue and concluded they do not have such authority. At one end of the spectrum of disciplinary recommendations lies action that constitutes merely having some input into decisions affecting others' employment status, while at the other end is action equivalent to having the final word. *See Stop & Shop Cos., Inc. v. NLRB,* 548 F.2d 17, 19 (1st Cir.1977). Unfortunately, Congress provided no express guidance as to where to draw the line distinguishing effective recommendations from mere input. The Board reads the phrase "effectively to recommend" as "generally mean[ing] that the recommended action is taken with *no* independent investigation by superiors, not simply that the recommendation ultimately is followed," J.A. at 24 (Decision and Direction of Election dated June 22, 1995) (quotation omitted) (emphasis in original), and that "[a]uthority simply to evaluate employees without more is insufficient to find supervisory status." J.A. at 27 (Decision and Direction of Election dated June 22, 1995). By focusing on the word "effectively" in the phrase "effectively to recommend," the Board's approach respects Congress's intent to limit the category of supervisors to only those with true supervisory authority. The Board's definition does not cover employees whose role in evaluating the performance of other employees is largely reportorial, but does encompass those whose participation amounts to bearing responsibility for any disciplinary decision. We therefore should defer to the Board's interpretation of the phrase "effectively to recommend."

I believe substantial evidence supports the Board's conclusion that the nurses in this case do not effectively recommend discipline or other action affecting the employment status of the nurses' aides. As explained previously, any disciplinary action taken against an aide is determined only after the Director of Nursing or an Assistant Director of Nursing reviews the aide's personnel file and discusses the details of the misconduct with the aide, J.A. at 304–09, and the involvement of a nurse is limited to providing information. J.A. at 689–91. Moreover, the Director of Nursing, Kim Runci, was unable to identify any case where a nurse's evaluation of an aide affected the job status of an aide without any further investigation by higher authority. J.A. at 341, 344, 370, 374–77. Under these circumstances, the Board reasonably concluded that the nurses do not "effectively" recommend changes in aides' job status, but merely have limited input in such decisions. *See Beverly Enter.—Pennsylvania*, 129 F.3d at 1270–71 (holding that where LPNs do not have the authority to issue written warnings without higher approval or to terminate or suspend nurses aides, the Board's determination that the LPNs do not actually discipline or effectively recommend discipline was supported by substantial evidence); *cf. Highland Superstores*, 927 F.2d at 922 (leadman's role at performance review meetings limited to providing factual information, "and the mere reporting of facts is not enough to make the reporter a supervisor"); *Stop & Shop*, 548 F.2d at 19–20 (enforcing the Board's conclusion that pharmacy managers were not supervisors even though the managers filled out performance review forms concerning clerks that sometimes played some part in the grant of merit raises). We must therefore defer to the Board's conclusions. *See Fall River Dyeing & Finishing Corp.*, 482 U.S. at 42, 107 S.Ct. at 2235; *YHA*, 2 F.3d at 172.

### III. CONCLUSION

Rather than defer to the Board's expertise, the Sixth Circuit has insisted on substituting its own construction of the rather ambiguous terms defining "supervisor" for that of the Board, as well as supplanting the Board's assessment with its own view as to what factual showing satisfies the statutory definition of "supervisor." In so doing, this court has exceeded its authority as prescribed by *Chevron* and *Holly Farms*. Moreover, I fear our precedent obliterates any distinction between those with minor supervisory duties and true supervisors. Because most professionals exercise some minor supervisory authority, this circuit's broad interpretation of the term "supervisor" threatens to strip professionals of the Act's protections in contravention of Congress's intent to include working professionals among the class of employees covered by the Act. The end result in this circuit is that virtually all nurses working in nursing homes are deemed by this court to be supervisors, a result that seems to me to be contrary to the intent of Congress, the law of other circuits, and the decisions of the Board.

Despite my serious misgivings regarding this circuit's prior holdings in cases examining the supervisory status of charge nurses, I am bound by our precedent. Because the facts of this case closely parallel prior Sixth Circuit decisions rejecting the Board's finding that charge nurses were not supervisors, I concur in the judgment.