**KENTUCKY RIVER COMMUNITY CARE, INC., Petitioner/Cross– Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross– Petitioner,**

Kentucky State District Council
of Carpenters, AFL–CIO,
Intervenor.

Nos. 97–5885, 97–5983.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 5, 1998.

Decided Oct. 4, 1999.

Cheryl E. Bruner (briefed), Dinsmore & Shohl, Cincinnati, OH; Michael W. Hawkins (argued and briefed), Covington, KY, for Petitioner/Cross–Respondent.

Fred L. Cornnell, Jr. (briefed), Daniel J. Michalski (argued and briefed), Aileen A. Armstrong (briefed), John D. Burgoyne, National Labor Relations Board, Washington, DC, for Respondent/Cross–Petitioner.

Thomas J. Schulz (argued and briefed), Kentucky State District Council of Carpenters, AFL–CIO, Frankfort, KY, for Intervenor.

Before: JONES, RYAN, and BATCHELDER, Circuit Judges.

RYAN, J., delivered the opinion of the court, in which BATCHELDER, J., joined. JONES, J. (pp. 21–23), delivered a separate dissenting opinion.

## OPINION

RYAN, Circuit Judge.

This is another in an increasing number of cases involving the question whether nurses are supervisors within the meaning of the National Labor Relations Act, 29 U.S.C. § 152(11), in which we are required to direct the National Labor Relations Board to apply the law as this court has announced it, and not as the Board would prefer it to be.

The petitioner, Kentucky River Community Care, Inc. (KRCC), seeks to avoid union certification, claiming that (1) it is a political subdivision and therefore not an "employer" subject to the National Labor Relations Act, and (2) even if it is an employer for purposes of the NLRA, its registered nurses and rehabilitation counselors are "supervisors" and, therefore, exempt from the collective bargaining unit.

The National Labor Relations Board cross petitions, seeking enforcement of its order requiring KRCC to bargain with the union. We hold that KRCC is not a political subdivision, and that while the registered nurses KRCC employs are supervisors, the rehabilitation counselors are not. We therefore enforce the NLRB's order except insofar as it includes the registered nurses in the bargaining unit.

### I.

KRCC is a nonprofit organization operating numerous mental health facilities throughout an eight-county region of Kentucky. One such facility is the Caney Creek Rehabilitation Center, which is the subject of this appeal. These facilities are transitional residential centers whose mission is to help patients become self sufficient.

Because we first address the issue whether KRCC is a political subdivision, our review of the facts entails an inquiry into the KRCC corporate structure.

### A.

The then-Chairman of the East Kentucky Health Planning Council, C. Vernon Cooper, Jr., filed the articles of incorporation for KRCC on May 21, 1979. Cooper signed the articles as "a citizen of the Commonwealth of Kentucky," and there is no indication from the articles or the manner in which Cooper signed his name that he was acting in any official capacity. The articles enumerate various purposes of the corporation. Principal among them is that KRCC was formed to provide mental

health care; to serve as a regional mental health-mental retardation board; and to apply for, receive, and administer public and private funds. The articles are silent as to whether KRCC is to operate as an arm of the state or local government.

According to the minutes of KRCC's first board of directors meeting, "the [eight] County Judges . . . file[d] names for new mental health board members." Subsequent vacancies have been filled by a vote of the remaining directors. The minutes also offer an insight into the reason KRCC was organized. Prior to KRCC's incorporation, the Upper Kentucky River Regional Mental Health/Mental Retardation Comprehensive Care Center was responsible for providing mental health care to people living in the affected communities. Unnamed "local agencies" expressed concerns about the quality of mental health services being provided in the area due to staffing and personnel difficulties within the Board. In order to rectify the situation, the Kentucky Cabinet for Human Resources sent in a caretaker/administrator to run Upper Kentucky. In due course, Upper Kentucky dissolved, and KRCC was formed.

At KRCC's first meeting, the Deputy Commissioner for Mental Health of the Bureau for Health Services, "assured [the KRCC directors of] support from the [Kentucky] Cabinet for Human Resources." Within a few weeks, the Cabinet for Human Resources issued an administrative order stating:

WHEREAS, Kentucky River Community Care, Inc. has submitted a request to the [Cabinet] for Human Resources to be recognized as a regional community mental health-mental retardation board pursuant to the provisions of KRS 210.370 to 210.480; and

WHEREAS, Kentucky River Community Care, Inc. has expressed its intention to bring its board composition, by-laws, articles of incorporation and operations into compliance with all [Cabinet]

for Human Resources standards as rapidly as possible;

NOW, THEREFORE, by the authority vested in me by KRS 210.370 to 210.480 and 902 KAR 6:030(2) relating to regional mental health-mental retardation boards, I, Peter D. Conn, Secretary of the [Cabinet] for Human Resources, do hereby recognize Kentucky River Community Care, Inc. as the regional mental health-mental retardation board for the counties of Breathitt, Knott, Lee, Leslie, Letcher, Owsley, Perry, and Wolfe, contingent upon full compliance with all applicable laws, regulations and policies within one hundred and twenty days (120) from the effective date of this Order.

KRCC's bylaws refer to the provisions of the Kentucky Revised Statutes addressing mental health and mental retardation services. The bylaws require the board of directors to "[r]eview and evaluate mental health and mental retardation services provided pursuant to KRS 210.370 to 210.480, and report thereon to the Secretary for Health Services. . . ." In addition, KRCC's board of directors must ensure that its programs comply with the regulations issued under Kentucky Revised Statutes sections 210.370 to 210.480. The bylaws also contain a provision requiring the board of directors to be representative of the counties KRCC serves as specified in Kentucky Revised Statutes section 210.380. Although referring to the statutory scheme, the bylaws, like the articles of incorporation, are silent as to whether KRCC was formed to act as an administrative arm of the state.

KRCC and the Kentucky Cabinet for Health Services, Department for Mental Health and Mental Retardation Services entered into a contract in which KRCC agreed to provide mental health services within its eight-county region. A separate contract governed the operations of the Caney Creek Rehabilitation Center. These contracts incorporated by reference the statutory scheme found in Chapter 210

of the Kentucky Revised Statutes. The contracts contained guidelines for the services KRCC provides and eligibility restrictions for patients. For example, KRCC must meet certain staffing requirements, submit budget proposals, and develop personnel policies. KRCC must comply with these provisions in order to receive state funding.

### B.

Early in 1997, the Kentucky State District Council of Carpenters, AFL–CIO, an intervenor in this suit, petitioned the NLRB for certification as the collective bargaining representative for Caney Creek's 110 employees. There are four, 20–bed units at the facility, and each is staffed with five rehabilitation counselors and 10 rehabilitation assistants. Caney Creek employs six registered nurses and a licensed practical nurse to provide care throughout all the units. The facility is staffed 24 hours per day, with a full staff in place only on the first shift.

At the NLRB representation hearing, KRCC objected to union certification, claiming that it was a "political subdivision" within the meaning of section 2(11) of the NLRA, and therefore not an employer whose employees could be organized. KRCC also argued that even if it were not a political subdivision, its registered nurses and rehabilitation counselors could not be included in any proposed bargaining unit because these employees were supervisors. The NLRB conducted a hearing on the issues.

After the hearing, but before a decision was issued, KRCC moved to reopen the record, seeking to introduce certain evidence that had been excluded by the hearing officer. The additional evidence comprised information concerning the control or potential control by state agencies of KRCC's operations. The NLRB denied this request, concluding that the evidence at issue "went merely to the financial or administrative governmental control or potential control over its operations," and

that the decision of the hearing officer to exclude the proffered evidence was not prejudicial error.

The NLRB Regional Director then issued a decision and direction of election, rejecting KRCC's claim that it was a political subdivision and its claim that the registered nurses and rehabilitation counselors were supervisors. KRCC requested review of the Regional Director's decision, but the NLRB denied the request.

Shortly thereafter, an election was held, and the employees voted in favor of union representation. The Regional Director certified the Union as the exclusive collective-bargaining representative, but KRCC refused the Union's requests to bargain. The NLRB then issued a complaint alleging that KRCC's refusal to bargain violated sections 8(a)(1) and 8(a)(5) of the NLRA. KRCC responded that the union certification was invalid because it is not an employer within the meaning of section 2(2) of the NLRA. The NLRB upheld the union certification, and found that KRCC's refusal to bargain was an unfair labor practice. The NLRB ordered KRCC to bargain with the Union. It is from this decision and order that KRCC now appeals.

### II.

In an appeal from an NLRB decision, we review the board's legal conclusions *de novo* and its factual findings under a substantial evidence standard. *See NLRB v. Good Shepherd Home, Inc.*, 145 F.3d 814, 816 (6th Cir.1998). We must consider the entire record to determine whether the NLRB's findings are supported by substantial evidence. *See Grancare, Inc. v. NLRB*, 137 F.3d 372, 375 (6th Cir.1998).

### III.

First, we must decide whether KRCC is a political subdivision: if it is, it is not an employer subject to the NLRA. 29 U.S.C.

§ 152(2). KRCC argues that the NLRB's decision that KRCC is not a political subdivision is not supported by substantial evidence. KRCC claims the NLRB incorrectly applied the test to determine whether it qualified as a political subdivision, and also that the hearing officer erroneously excluded evidence that would have helped KRCC substantiate its claim that it is an arm of the government.

### A.

■ Section 2(2) of the NLRA excludes from the definition of employer "any State or political subdivision thereof." 29 U.S.C. § 152(2). The Supreme Court has held that an entity is exempt from the NLRA if it is either "(1) created directly by the state, so as to constitute [a] department[ ] or administrative arm[ ] of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate." *NLRB v. Natural Gas Util. Dist.*, 402 U.S. 600, 604–05, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971).

In its decision and direction of election, the NLRB Regional Director applied the test articulated in *Natural Gas* and concluded that KRCC was not created as an arm of the state, and that KRCC was not administered by individuals who are responsible to public officials or the general electorate.

### 1.

■ To satisfy the first prong of the Natural Gas test, KRCC must show that it was created directly by the state, *and* that the state intended KRCC to operate as an arm of state government. KRCC claims it was created directly by the state, thus satisfying the first part of the test. In support, KRCC maintains that both state and county officials actively participated in creating KRCC; that a public official filed the articles of incorporation; that local government agencies requested the dissolution of KRCC's predecessor; and that county judges assisted in selecting KRCC's initial board of directors. KRCC

argues that it would not exist but for the initiative of the various public officials involved.

In *Crestline Memorial Hospital Association v. NLRB*, 668 F.2d 243 (6th Cir. 1982), the hospital claimed exemption from the NLRA under the political subdivision exception. The city of Crestline leased facilities to Crestline Memorial Hospital on the condition that Crestline Memorial operate these facilities as a municipal general hospital. *See id.* at 244. This court rejected the hospital's contention, noting that the hospital could not have been "created by the state" because "it was and remains a private, nonprofit corporation ... operating certain facilities leased from the City." *Id.* at 245.

The facts in *Crestline* are analogous to the situation we address here. KRCC is a private, nonprofit corporation, operating mental health and mental retardation facilities pursuant to contracts. There is nothing in KRCC's articles of incorporation to support its claim that it was created by the state. Cooper filed the articles of incorporation as an individual, and the Commonwealth of Kentucky took no government action to create KRCC. Only after the corporation was formed did the Cabinet for Human Resources "recognize" it as a mental health-mental retardation board. We are satisfied that KRCC was not formed directly by the state, as required by the first prong of the *Natural Gas* test, and because we find it was not, it is unnecessary to address KRCC's next series of arguments that purport to show that the state intended KRCC to serve as an arm of the Kentucky government.

### 2.

■ We turn next to the alternative basis announced in *Natural Gas* for determining whether KRCC is a political subdivision of the state: whether, as KRCC claims, it is "administered by individuals who are responsible to public officials or to the general electorate." *Id.*

KRCC argues, first, that because the Secretary of the Cabinet for Human Resources has significant control over KRCC's operations, KRCC is an organization run by individuals responsible to public officials. Specifically, the Secretary has authority to appoint a caretaker for KRCC and make personnel changes without the consent of the corporation's board. In addition, the Secretary has authority to review and disapprove of the board's personnel policies and compensation plans. The Cabinet for Human Resources also dictates the services KRCC will provide and how many employees KRCC will need. Therefore, KRCC claims, it is responsible to the Secretary of the Cabinet for Human Resources.

To be sure, the Secretary of the Cabinet for Human Resources exercises significant oversight of KRCC's operations. The oversight arises because KRCC has sought recognition as a local mental health-mental retardation board, but it does not necessarily follow that such oversight means that the individuals in charge at KRCC are responsible to public officials. We find nothing in the oversight authority of the Cabinet for Human Resources or in the internal structure of the KRCC that makes the individuals in charge at KRCC responsible to the Cabinet for Human Resources.

Second, KRCC argues that the state controls the composition of KRCC's board of directors, and, therefore, the directors are answerable to the state, thus satisfying the second prong of the *Natural Gas* test. KRCC selects its board members in the fashion required by Kentucky law governing mental health-mental retardation boards. The statute specifies that the board of directors must be representative of the community the corporation serves. *See* Ky.Rev.Stat. § 210.380. The law also provides that the "appointing authority" may remove a board member for certain misconduct. *See* Ky.Rev.Stat. § 210.390. In the event of a vacancy on the KRCC board of directors, the remaining board members select a replacement.

In *Pikeville United Methodist Hospital of Kentucky, Inc. v. United Steelworkers of America, AFL–CIO–CLC,* 109 F.3d 1146 (6th Cir.1997), this court addressed this second prong of the political subdivision test of *Natural Gas,* requiring responsibility to public officials. We concluded that the hospital administrators in *Pikeville* were not responsible to public officials, noting that "[n]o law or ordinance ... requires that the board of directors ... be elected by the general populace or requires that those board members be public officials...." *Id.* at 1151. We noted also that the city could not control the composition of the board of directors. *See id.*

Contrary to KRCC's assertions, neither any Kentucky public official nor the general public control the composition of KRCC's board of directors. KRCC complies with the state law requiring the board to be representative of the community served, but this is only because KRCC seeks to operate as a local mental health-mental retardation board.

Section 210.390 of the Kentucky Revised Statutes provides:

> ... Any member of a board may be removed by the appointing authority for neglect of duty, misconduct or malfeasance in office, after being given a written statement of charges and an opportunity to be heard thereon.

Ky.Rev.Stat. § 210.390. KRCC asks us to read that provision as giving the state the power to remove directors. Considering that vacancies on the board are filled by a vote of the remaining board members, it is unlikely that the state is the "appointing authority." It is more likely that the board of directors itself is the appointing authority. However, we need not answer this question. Assuming *arguendo* that the state can remove a director for misconduct, we are not persuaded that KRCC is run by individuals responsible to public officials or to the general electorate. KRCC chose to subject itself to this regu-

lation by becoming a local mental health-mental retardation board. If KRCC ceased operating as a local board, the state would no longer have any influence over the board of directors.

Therefore, we conclude that substantial evidence supports the NLRB conclusion that KRCC was not created by the state and is not administered by individuals that are responsible to public officials or to the general electorate, as required by *Natural Gas*, 402 U.S. at 604–05, 91 S.Ct. 1746.

### B.

KRCC next argues that the hearing officer should have permitted the introduction of evidence which would have helped establish that KRCC was created for a public purpose and show that the state retained control of its operations.

The proffered testimony spoke to the following points: the state's ability to effectuate change in personnel policies at KRCC; the state's authority to appoint a caretaker/administrator in emergency situations; the state's past appointment of caretakers; the requirement that the state review any collective bargaining agreement; and testimony from a legislator about the initial legislative rationale behind creation of the local boards. KRCC also proffered an affidavit from a former governor of Kentucky containing his thoughts and opinion that the boards are agencies of the state.

 We review for an abuse of discretion the decision to exclude evidence. *Dayton Hudson Dep't Store Co. v. NLRB*, 79 F.3d 546, 552 (6th Cir.1996). Insofar as the evidence the ALJ excluded relates to the state's authority to effectuate change in personnel policies and to appoint a caretaker in emergencies, the record already contained the statutes and regulations supporting these. *See* Ky.Rev.Stat. § 210.440(3); 908 Ky. Admin. Regs. 2:020.2. Therefore, the decision to exclude this cumulative evidence cannot be said to

have unfairly prejudiced KRCC. *See Segal v. Cook*, 329 F.2d .278, 280 (6th Cir.1964).

 The former governor's opinion as to whether KRCC is a political subdivision as defined by federal law, is manifestly an opinion on a matter of law, and therefore not competent evidence on the question. *See Western Air Lines, Inc. v. Board of Equalization*, 480 U.S. 123, 131 n. *, 107 S.Ct. 1038, 94 L.Ed.2d 112 (1987). Testimony from a drafter of the Kentucky statutory scheme sheds no light on whether the Commonwealth of Kentucky formed KRCC to act as an arm of the government; nor is it instructive as to whether the individuals running KRCC are responsible to public officials or to the general electorate. All the testimony might have provided is one legislator's understanding of the meaning of the statute. Therefore, we reject KRCC's contention that the ALJ abused his discretion in excluding the proffered evidence.

### IV.

KRCC maintains that even if it is an employer subject to the NLRA, the registered nurses and rehabilitation counselors it employs are supervisors and therefore exempt from the collective bargaining unit under 29 U.S.C. § 152(11). The NLRA applies to "employees." 29 U.S.C. § 152(3). Individuals employed as supervisors are specifically excluded from the definition of employee. *See id.*

 The NLRA defines "supervisor" as:

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). Thus, an employee is a supervisor if he (1) has the authority to engage in one of the activities enumerated in section 152(11), (2) uses independent judgment in that activity, and (3) does so in the interest of the employer. *See Grancare*, 137 F.3d at 375. This definition is a substantively binding rule of law in this court that is no longer open to question.

In concluding that KRCC's registered nurses and rehabilitation counselors are not supervisors, the NLRB assigned the burden of proving supervisory status to KRCC. This ignores our repeated admonition that "[t]he [NLRB] has the burden of proving that employees are not supervisors." *Id.* KRCC claims the registered nurses and rehabilitation counselors exercise independent judgment in directing other employees, and do so in the interest of the employer. The Board found that they do not.

Although we have issued a number of opinions in the last year finding that nurses are supervisors, and rejecting the NLRB's stubborn insistence that they are not, we acknowledge that whether an employee is a supervisor is a highly fact-intensive inquiry, and therefore, each case must be scrutinized carefully.

## A. Nurses

During some of the second and all of the third shift at Caney Creek—almost two thirds of the day—the registered nurses act as building supervisors. Although a registered nurse is the highest ranking employee in the building throughout these periods, an administrator is always "on call." According to Caney Creek's procedures, the registered nurses acting as building supervisors are "in charge of the facility and all rehabilitation staff." The building supervisor is responsible for patient care and must ensure adequate staffing. According to an internal memorandum in the record, the nurses acting as building supervisors at Caney Creek are authorized to shift staff between units and must "write up anyone who does not comply with the request immediately." In addition, the nurses have authority to call employees into work early or ask employees to remain on duty beyond the normal end of shift in the event of staff shortages, although the nurses do not have authority to force an employee to work in these situations. The registered nurses do not retain keys to the facility, although they have access to a set of keys that they must give to the security guard when he comes on duty.

The registered nurses are responsible for medical services, particularly when there are no doctors in the building, which is frequently the case. The registered nurses are also responsible for ensuring that the licensed practical nurses properly dispense patient medications. The registered nurses do not make the initial work schedules, but they are expected to deal with situations in which the facility might become shorthanded for any reason. A nurse, acting as building supervisor, could send an employee home, but the nurse would then need to inform that employee's immediate supervisor.

Our task is to decide whether these responsibilities call for the exercise of "independent judgment" under section 152(11). Unfortunately, the NLRB has continuously interpreted "independent judgment" in a manner that is inconsistent with this circuit's precedent. According to NLRB interpretations, the practice of a nurse supervising a nurse's aide in administering patient care, for example, does not involve "independent judgment." The NLRB classifies these activities as "routine" because the nurses have the ability to direct patient care by virtue of their training and expertise, not because of their connection with "management." This court, however, has repeatedly rejected this interpretation, and found that nurses are supervisors when they direct assistants with respect to patient care, rectify staffing shortages, fill out evaluation forms, and serve as the highest ranking employee

in the building during off-peak shifts. *See Mid–America Care Foundation v. NLRB*, 148 F.3d 638, 641 (6th Cir.1998).

In *Mid–America*, we addressed the NLRB's argument that this court should defer to the board's interpretation of "independent judgment." In reversing the NLRB's conclusion that nurses are not supervisors, we held that the NLRB interpretation was not entitled to the normal deference given to agency interpretations of ambiguous provisions because the rule announced differed from the NLRB's actual application of this rule. *See id.* at 642.

> [W]hen an agency's *application* of a statutory interpretation (which itself ordinarily would be entitled to deference) frustrates judicial review by "subtly and obliquely" revising the stated interpretation to impose a more stringent definition or a higher standard of compliance in certain factual contexts, *Chevron* deference is inappropriate.

*Id.* (citing *Allentown Mack Sales & Serv., Inc. v. NLRB,* 522 U.S. 359, 118 S.Ct. 818, 827–28, 139 L.Ed.2d 797 (1998) and *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). This court has continued to overturn NLRB decisions finding that nurses are not supervisors even though the nurses direct others in providing patient care, address scheduling shortages, and have some evaluative role with respect to other employees. This court, not the NLRB, is the ultimate interpreter of this statutory provision, and we again reject the NLRB's wooden and narrow definition of the term "independent judgment."

The registered nurses at KRCC direct the LPNs in the proper dispensing of medication, regularly serve as the highest ranking employees in the building, seek additional employees in the event of a staffing shortage, move employees between units as needed, and have the authority to write up employees who do not cooperate with staffing assignments. These duties involve independent judgment which is not limited to, or inherent in, the professional training of nurses. These duties are supervisory in nature, and there can be no doubt that these activities are conducted in the interest of the employer. *See NLRB v. Health Care & Retirement Corp. of Am.,* 511 U.S. 571, 577, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994). After a careful examination of the record, we conclude that the evidence readily establishes that Caney Creek's registered nurses are supervisors, and does not support the NLRB's decision to include them in the bargaining unit.

## B. Rehabilitation Counselors

We turn finally to KRCC's claim that the rehabilitation counselors at Caney Creek are supervisors because they supervise the rehabilitation assistants. The job titles for the positions in question—rehabilitation counselor and rehabilitation assistant—would suggest, without more, some supervisory role for a counselor over an assistant. But it is the record evidence concerning their respective functions and their relationship to one another that is determinative.

When a patient enters the facility, a rehabilitation counselor evaluates the patient's needs and develops a comprehensive treatment plan, with the ultimate goal of helping the patient to become self-sufficient. This plan and any changes made to it must be approved by a psychiatrist. If the plan is approved, it is carried out on a daily basis primarily by the rehabilitation assistants.

The job description for rehabilitation counselors does not explicitly reference supervisory responsibilities; however, it states that the counselors "[m]ay provide direction to assigned Rehabilitation Assistants and service provision to residents." Counselors must hold a bachelor's degree in a human services field; or an LPN certificate, together with 2 to 4 years of experience; or an associate's degree in nursing without licensure.

Rehabilitation counselors do not have any hiring responsibilities. If a counselor observes an assistant acting inappropriately, the counselor discusses the matter with the assistant and tries to resolve the issue without resort to any formal procedures. If that approach fails, in order to resolve the issue the counselor prepares an incident report, but the counselors do not have any disciplinary authority beyond the incident report. The rehabilitation counselors do not have the authority to transfer assistants between units, and have no authority to address a rehabilitation assistant's grievances.

The rehabilitation counselors do not schedule the assistants. Each morning, the counselors meet with the assistants and the assistants volunteer for particular tasks. A counselor may also ask an assistant to work for a shorthanded unit. The assistants report to the counselors at "informal team meetings" as to how a patient is progressing or participating in the program.

The job description form for rehabilitation assistants specifies that they report to a Treatment Assistant or a Treatment Coordinator. If a rehabilitation assistant has a problem with a patient, he contacts the counselor, and after a "back and forth" discussion, the counselor tells the assistant what to do. An assistant might also handle a problem with a patient on his own and then notify the proper person after the fact. The only educational requirement is a high school diploma or GED.

The standards we have applied to the registered nurses apply with equal force to the rehabilitation counselors for determining whether the counselors are supervisors. The rehabilitation counselors must (1) have the authority to engage in one of the activities enumerated in section 152(11), (2) use independent judgment in that activity, and (3) do so in the interest of the employer. *See Grancare,* 137 F.3d at 375.

At KRCC, the primary function of the rehabilitation counselor is to design a pa-tient treatment plan. This does not, of itself, involve any supervisory authority. Neither does the working relationship between the counselors and assistants imply any supervision of the work of the assistants by the counselors. The counselors do not hire or fire the assistants, and they do not assign the assistants to particular units or patients. The fact that the assistants carry out the provisions of the treatment plans designed by the counselors does not suggest that the counselors are supervisors. The record reflects more of a cooperative relationship between the rehabilitation counselors and rehabilitation assistants, with each performing a distinct but complementary function. Therefore, we hold that substantial evidence supports the NLRB's decision that the rehabilitation counselors are not supervisors and therefore to include them in the bargaining unit.

**V.**

For all of the foregoing reasons, we hold (1) that KRCC is not a "political subdivision" within the meaning of the NLRA; (2) that the registered nurses are supervisors within the meaning of the NLRA; and (3) that the rehabilitation counselors are not supervisors within the meaning of the NLRA.

KRCC's petition for review is **GRANTED** in part and **DENIED** in part, and the NLRB's petition for enforcement is **GRANTED** in part and **DENIED** in part.

NATHANIEL R. JONES, Circuit Judge, dissenting.

I concur with the majority's holding in all respects but one: that the registered nurses at KRCC are "supervisors" and thus exempt from coverage under § 2(11) of the NLRA, 29 U.S.C. § 152(11). Because I believe that the NLRB's conclusion to the contrary is supported by substantial evidence (*i.e.*, that the registered nurses are "employees" within the meaning of § 2(3) of the Act, 29 U.S.C. § 152(3)), I

would vote to enforce the NLRB's Order. Accordingly, I respectfully dissent.

The majority correctly notes that the NLRB's factual findings must be affirmed if they are supported by substantial evidence. *See ante* at 455. But the majority fails to articulate precisely what "substantial evidence" is. As we have frequently held in Social Security disability cases— cases of agency review where the "substantial evidence" standard likewise controls substantial evidence is more than a mere scintilla, but less than a preponderance of the evidence. *See Cutlip v. Secretary of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.1994) (*per curiam*); *Brainard v. Secretary of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir.1989) (*per curiam*); *see also Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co.*, 305 U.S. at 229, 59 S.Ct. 206; *accord Medical Rehabilitation Servs., P.C. v. Shalala*, 17 F.3d 828, 831 (6th Cir.1994) (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)); *Brainard*, 889 F.2d at 681. If we determine, after reviewing the administrative record as a whole, that the NLRB's factual findings are supported by substantial evidence, those findings must be affirmed, even if substantial evidence exists in the record to support an opposite decision. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir.1986) (en banc). A finding of substantial evidence thus mandates affirmance. *See Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 535–37 (6th Cir.1981).

Having conducted the "highly fact-intensive inquiry" required by the majority, *ante* at 453, I would find the NLRB's determination—that the six registered nurses employed at KRCC are *not* supervisors—supported by substantial evidence. The NLRB found, in relevant part, as follows:

The RNs do not receive any extra compensation for serving as "building supervisors" and do not have keys to the facility.

* * *

[T]he only extra responsibility assumed by the RNs when serving as "building supervisors" is to obtain needed help if for some reason a shift is not fully staffed. In the event a shift is understaffed, the RNs on duty will first attempt to find a volunteer to stay over from among the employees on the proceeding shift. If a volunteer cannot be obtained from the employees on the preceding shift, the "building supervisor," using a list containing the names, telephone numbers and addresses of the employees, will attempt to reach an off-duty employee who lives nearby to come in and cover the shift. The "building supervisors" do not have any authority, however, to compel an employee to stay over or come in to fill a vacancy under threat of discipline.

It appears that the RNs may occasionally request other employees to perform routine tasks, but they apparently have no authority to take any action if the employee refuses their directives. The RNs may also complete incident reports, but so can any other employee. All incident reports are independently investigated by the nursing or unit coordinators to determine if any disciplinary action is warranted and it does not appear that these management officials seek any input from the RNs involved. Although [KRCC] asserts ... that RNs can "write-up" employees, there is no evidence in the record that they have ever done so. . . .

* * *

The RNs in their normal capacity or as "building supervisors" do not have the authority to hire, fire, reward, promote or independently discipline employees or

to effectively recommend such action. They do not evaluate employees or take any action which would affect their employment status. Indeed, the RNs, including when they are serving as "building supervisors," for the most part, work independently and by themselves without any subordinates.

J.A., vol. II, at 297–98 (quotations in original). In my view, these well-reasoned findings unquestionably constitute "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" that the six RNs at KRCC are "employees" within the meaning of 29 U.S.C. § 152(3).

I would therefore hold that the collective bargaining unit at KRCC *includes* the six registered nurses, and vote to enforce the NLRB's July 10, 1997 Order in its entirety.